```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

JIMMY CAVALIER                              CIVIL ACTION

VERSUS                                      NUMBER: 07-3272

MICHAEL J. ASTRUE,                          SECTION: "N"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION
```

**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based on disability. (Rec. docs. 9, 12).

Jimmy Cavalier, plaintiff herein, filed the subject applications for DIB and SSI benefits on June 15, 2005, with a protective filing date of June 9, 2005, alleging disability as of

March 1, 2005. (Tr. pp. 43-45, 151-154, 42). In a Disability Report completed on June 27, 2005, "[b]ack trouble/neck injury, shoulder problems" were identified as the conditions resulting in plaintiff's inability to work. (Tr. pp. 53-58). Those conditions first began bothering plaintiff in 1999 and ultimately rendered him unable to work on the stated onset date. (Id.). Plaintiff's applications for DIB and SSI benefits were denied at the first step of the Commissioner's administrative review process on August 5, 2005. (Tr. p. 150). Pursuant to his request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on December 20, 2006 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 155-177). On February 5, 2007, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 10-21). The Appeals Council ("AC") subsequently denied plaintiff's requests for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 4-6). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, plaintiff frames the solo issue for judicial review as follows:

> [d]id the Administrative Law Judge err in

>   determining that the claimant was not disabled
>   from the March 1, 2005 or thereafter.
>
>                                          (Rec. doc. 9-2, p. 2).

Relevant to the issue to be decided by the Court are the following findings made by the ALJ:

1. [t]he claimant meets the insured status requirements of the Social Security Act through September 30, 2009.

2. [t]he claimant has engaged in substantial gainful activity since March 1, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*)

3. [t]he claimant has the following severe impairments: neck, shoulder and back pain (<u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985); SSR 96-3p; 20 CFR 404.1520(c) and 416.920(c)).

4. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 out of 8 hours in an 8-hour workday with normal breaks; no climbing ladders, ropes or scaffolds; no work at unprotected heights; capable of understanding, remembering and carrying out detailed but not complex work; making decisions; attending and concentration for extended periods and dealing appropriately with workplace peers, bosses and occasional routine work changes.

6. [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. [t]he claimant was born on June 3, 1967 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. [t]he claimant has a marginal education and is able

        to communicate in English (20 CFR 404.1564 and 416.964).

9.   [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

11. [t]he claimant has not been under a "disability," as defined in the Social Security Act, from March 1, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

                                                      (Tr. pp. 15-20).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion. Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the 5-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

    1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

    2. an individual who does not have a "severe impairment" will not be found to be disabled.

    3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

>    4.   if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.
>
>    5.   if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first 4 steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

As noted earlier, a hearing de novo before an ALJ was held on December 20, 2006. At the start of the hearing it was revealed that plaintiff had filed 4 previous applications for Social Security benefits and had reached a stipulation with the Administration in connection with 1 of those applications as to being disabled for a closed period of 22 months. With plaintiff's earnings records in hand, the ALJ questioned plaintiff about the income he had reported receiving between 2002 and 2005. In answer to the ALJ's inquiry, plaintiff explained that his wife had

actually performed the labor resulting in the earnings but had reported it under plaintiff's Social Security number because the required alligator fishing license was in his name.  Plaintiff did admit to working 9 days painting stair railings on FEMA trailers following Hurricane Katrina but he eventually quit that job due to back pain.  Aside from this brief stint, plaintiff testified that he had not worked since being involved in an automobile accident in 1999.

At the time of the administrative hearing, plaintiff was 39 years of age and had completed 6 years of formal education.  He testified to undergoing surgery at the hands of Dr. John Jackson in 2000.  A functional capacity evaluation ("FCE") subsequently conducted in 2001 revealed that plaintiff was capable of light level work with no lifting in excess of 20 pounds but he was much more limited at the time.  Plaintiff testified that he had attempted to perform such work but was unable to do so due to back pain after being on his feet 30 to 40 minutes. He estimated that he could stand or sit for 30 to 45 minutes at a time. In 2003, Dr. Broussard had recommended that plaintiff undergo surgery to correct the collarbone that he had broken in his 1999 accident but he declined.  Injections from Dr. Broussard in late 2004 and March of 2005, and another 1 from his family doctor 3 months later, did provide some relief. Plaintiff testified to seeing Dr. Broussard again in July of 2006 who referred him to Dr. Mark Fields, a shoulder surgeon.  On that point, plaintiff testified to experiencing ongoing problems with his shoulders and being totally unable to move his arms once or twice per week as well as sleeping

difficulties. Sciatica was reportedly diagnosed following a consultative evaluation in July of 2005; MRI and nerve conduction studies had been recommended but not performed, and plaintiff had at some point undergone a back fusion. Since his 1999 accident, plaintiff experienced pain on a daily basis. At home, he would lie down for pain relief between alternating periods of standing and sitting. (Tr. pp. 157-169).

Katrina Virden, a VE, was next to take the stand. She was presented with a hypothetical question by the ALJ which assumed an individual of plaintiff's age, education, and work experience who was limited to lifting 20 pounds occasionally, 10 pounds frequently; who could stand/walk/sit for 6 hours per 8-hour workday; who was unable to perform overhead work with the left arm; and, who could not climb ladders or scaffolds or work at unprotected heights. In answer thereto, the VE testified that the individual described in the hypo could not perform plaintiff's past work. However, the hypothetical individual could perform the following light level jobs, significant numbers of which existed in the national and local economies: gate guard, housekeeper, and cafeteria attendant. If the individual had to alternate standing and sitting positions every 45 minutes, the VE testified that the guard and cafeteria worker jobs could still be performed as well as that of surveillance system monitor, a sedentary, unskilled position. The VE did acknowledge that if the individual missed more than 2 workdays per month, had to repeatedly take breaks to lie down, or was otherwise unable to work a 40-hour week on a sustained basis, the identified jobs could not be performed.

Although tendered to plaintiff's attorney for cross-examination, counsel had no questions for the VE. (Tr. pp. 169-177).

The documentary evidence admitted in the administrative proceedings below begins with a medical report from Dr. John D. Jackson dated February 15, 2000 supplementing a previous report he had generated following an evaluation of plaintiff that was performed on February 7, 2000. In view of plaintiff's condition at the time, Dr. Jackson believed that he should not be working but receiving conservative treatment instead so as not to have a flare-up of his symptoms. (Tr. p. 131). When plaintiff returned to Dr. Jackson on March 27, 2000, his condition was no better and he was complaining of low back and thoracic area pain, numbness in the arms and legs, and some neck discomfort. A neurological examination revealed no pain on straight leg raising at 90 degrees and deep tendon reflexes were equal and active. In light of plaintiff's symptoms, Dr. Jackson scheduled a cervical, thoracic, and lumbar myelogram with a CT scan to follow at several levels. (Id.). The diagnostic tests were conducted and were reviewed by Dr. Jackson April 11, 2000. The myelogram did reveal some facet joint changes on the right at L5-L6 and very slight convexity at the T2-3 and T3-4 levels which was probably within normal limits but the CT scan that followed revealed a very tiny, slight bulge at T3-4 and T2-3 that was not compressing the dura significantly or the spinal cord. There was a bulging disc at L4-5 not productive of stenosis but at the L5-6 level there was a compression of the caudal sac and foraminal narrowing bilaterally, the right side greater than the left. Removal of the L5-6 disc with decompression

and possibly the L4-5 disc as well was contemplated. Dr. Jackson was to provide a copy of his report to plaintiff's local physician to ponder conservative versus surgical treatment options. (Tr. p. 130).

Plaintiff returned to Dr. Jackson on May 8, 2000 at which time the proposed surgical procedure was discussed in greater detail. Dr. Jackson explained that the disc at the L5-L6 level was ruptured and would require bilateral removal since it was circumscribed. Stabilization would be achieved by the introduction of Ray threaded cages to the affected level. Dr. Jackson also intended to inspect the L4-5 disc during the course of the procedure and to take whatever action may be needed at that level as well. The doctor was to defer to plaintiff's decision on whether to proceed with surgery. (Tr. p. 129). Plaintiff elected to go ahead with the surgery and on June 9, 2000, Dr. Jackson performed a bilateral L5-L6 partial hemilaminectomy and diskectomy and fusion bilaterally with Ray threaded cages in that disc space and a negative exploration at L4-5 through a partial hemilaminectomy on the left. Plaintiff was discharged home in satisfactory condition 2 days later with various prescription medications and an exercise regimen that would have him walking 1 mile per day 6 weeks post-op. (Tr. p. 80).

When plaintiff was seen again by Dr. Jackson on July 17, 2000, he did complain of some low back and buttocks pain and pain over the posterior aspect of the legs but otherwise the examination was normal. At that time, plaintiff was walking 1 mile twice per day and was taking no medication for pain relief. (Tr. p. 129). By

October 2, 2000, plaintiff was said to be doing well and was advised to discontinue use of a back brace. A neurological examination was normal and x-rays revealed that the inserted hardware was in perfect position. Plaintiff was to continue his walking routine to build up his strength and was not to engage in any activity that would put a strain on his back. (Tr. p. 128). Plaintiff's chief complaint was low back pain on November 30, 2000 but a neurological exam was normal and it was believed that his pain would lessen in time as the fusion solidified. Plaintiff was taking Celebrex twice per day and was given Zanaflex samples. (Tr. p. 128). He still had some daily low back pain on February 1, 2001 but he advised Dr. Jackson that he could live with it. Intermittent neck pain was also experienced. Plaintiff had decreased left Achilles and patella reflexes but a neurological exam was otherwise normal. (Tr. p. 127). X-rays taken the following day revealed that the fusion was progressing nicely with only a slight degree of motion remaining. Plaintiff was to continue taking vitamins daily and was given another 30-day supply of pain medication. (Id.).

On March 22, 2001, plaintiff reported that his low back pain and pain and discomfort in his shoulder and neck had worsened after he had stopped taking Celebrex 2 weeks earlier. Plaintiff had decreased to absent Achilles reflex on the left but gait was normal and straight leg raising was negative. He was given another prescription for Celebrex and was encouraged to consult with a psychiatrist to address the depression he was experiencing over his situation. (Tr. p. 126). By June 7, 2001, plaintiff was still

having some low back pain, severe at times, as well as occasional discomfort in the hip and occasional neck pain.  In the interim, plaintiff had begun seeing Dr. Todd Cowen for pain management.  The results of a neurological examination were essentially the same.  (Tr. p. 126).  X-rays taken on that date were interpreted as showing a satisfactory fusion.  Dr. Jackson recommended that plaintiff undergo a FCE to determine what type of work he was capable of.  The doctor did recommended, however, that plaintiff avoid lifting more than 25 pounds and not engage in any activity that would strain his back.  In Dr. Jackson's opinion, plaintiff had a 25% permanent partial disability to the body as a whole.  (Tr. pp. 126-125).

   The recommended FCE went forward on July 10, 2001. Results of the testing revealed that plaintiff was capable of work at the light exertional level with occasional lifting of 20 pounds and occasional bending, crawling, and climbing and with bending being limited to 25%.  (Tr. pp. 81-121).  Plaintiff was then seen by Dr. Cowen on July 18, 2001 at which time the results of the FCE were discussed.  Plaintiff was given a refill on his Paxil and Klonopin which were described as "... helping him quite nicely."  (Tr. p. 122).  He was next seen by Dr. Jackson on August 13, 2001 and reported pain in the neck, upper thoracic area, and low back which was not severe but was present at all times.  Plaintiff was walking 1 mile per day for exercise.  Neurological exam was unchanged and there was no muscle atrophy.  Dr. Jackson again cautioned plaintiff against lifting in excess of 20 to 25 pounds or engaging in activities that would put a strain on his back.  (Tr. p. 125).

Plaintiff returned to Dr. Jackson on December 3, 2001 and reported no improvement to his condition. The low back pain was now radiating down his left leg intermittently. (Tr. p. 124). An MRI performed on December 5, 2001 revealed that the cages were in the proper disc spaces. There was a very slight bulge at L3-4 and L5-S1 but no narrowing of the spinal canal or compression of the dura. Mild degenerative changes were also detected but Dr. Jackson stated that he was "... very pleased ..." with the scan which did not reveal any significant pathology in the lumbar area. Based on the results of the MRI and previous x-rays, Dr. Jackson saw no objective basis for plaintiff's complaints of low back and left hip pain. (Id.).

The next medical records were not generated until 14 months later when plaintiff underwent MRI studies of the shoulders on February 1, 2003. On the right, the test revealed a marked abnormal signal within the anterior superior glenoid labrum suspicious of a labral tear. (Tr. p. 135). On the left, plaintiff had mild degenerative joint disease of the A/C joint resulting in mild impingement of the supraspinatus tendon but no evidence of rotator cuff or labral tear. (Tr. p. 136). Dr. Thad Broussard discussed the test results with plaintiff on February 5, 2003 and elected to treat him conservatively with a Medrol Dose Pak. (Tr. pp. 149, 133). Plaintiff apparently received some type of injectable medication to the shoulders as Dr. Broussard remarked on February 19, 2003 that he "... has done well with the shots". Prescribed medication was also of some benefit to plaintiff and he advised the doctor that he just wanted to live with the pain the

way it was. Plaintiff was to schedule additional treatment with Dr. Broussard as needed. (Tr. p. 149). Plaintiff did not return to Dr. Broussard until June 21, 2004, some 14 months later, at which time another injection was administered. Oral medications, including a Medrol Dose Pak, were to be continued as they provided plaintiff with some relief. (Tr. pp. 149, 133).

On July 7, 2005, plaintiff completed the Administration's standardized Adult Function Report. When asked to describe the activities of a typical day, plaintiff wrote that he rose in the morning, moved about to get his body going, watched TV, visited with his mother, and performed chores such as folding clothes and washing dishes. He was still able to drive, attend to his own personal needs, go grocery shopping, and cook meals with his wife. (Tr. pp. 70-77).

On July 28, 2005, plaintiff was consultatively evaluated by Dr. Rohit Khanolkar. Plaintiff's primary complaint at the time was lower back pain, suggestive of sciatica, with pain radiating down the right lower extremity along with morning sickness that lasted about an hour. He advised Dr. Khanolkar that he was unable to lift more than 20 pounds, was unable to stand for more than 30 minutes, and was able to sit for less than 30 minutes. No complaints of upper or lower extremity weakness were voiced. Plaintiff further advised Dr. Khanolkar and that he could no longer afford pain medication. In documenting plaintiff's personal history, the doctor noted that plaintiff was independent in the activities of daily living, could drive for 45 minutes, and could mow the lawn but was unable to perform jobs requiring "... severe manual labor."

On physical examination, deep tendon reflexes were 2+, sensation was normal, and movement was normal with no stiffness or loss of motion in any joint. Straight leg raising was positive on the left. Plaintiff did have decreased anterior flexion in the lumbosacral spine to 45 degrees but extension was normal and the range of motion in the cervical spine was normal. A figure 4 test was positive in the left hip. Plaintiff had a normal gait, had no weakness, and had no focal or neurological deficits or atrophy. In spite of plaintiff's complaints of chronic neck pain, there was no evidence of neck pathology and range of motion was normal. Although there was evidence of rotator cuff tendonitis, there was no evidence of shoulder pathology. In light of his findings, Dr. Khanolkar recommended that plaintiff undergo an MRI of the lumbosacral spine and nerve conduction studies to better determine the cause of his lower back pain. (Tr. pp. 137-140).

After viewing the records then extant, on August 5, 2005, an Administrative medical consultant completed a Physical Residual Functional Capacity form designed to elicit opinions concerning plaintiff's capabilities. There, the medical consultant indicated that plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently; could stand, walk, and/or sit for 6 hours per 8-hour workday; had an unlimited ability to push and/or pull; could occasionally climb ladders/rope/scaffolds but could only frequently perform the other enumerated postural maneuvers; and, had no other manipulative, visual, communicative, or environmental limitations. In light of those findings, the consultant found credible plaintiff's stated inability to perform strenuous activity. The

consultant did not believe that his opinions were significantly different from those of the physicians who had examined and treated plaintiff. (Tr. pp. 141-148).

On March 13, 2006, plaintiff returned to Dr. Broussard for another set of injections to his shoulder area. The doctor noted that plaintiff's symptoms were essentially the same as those present at the time of his last office visit 21 months earlier. The plan was to continue to treat plaintiff with medications as they did provide relief. (Tr. p. 149). By July 18, 2006, plaintiff's condition was unchanged and the injections were becoming of limited value. A referral to Dr. Field was contemplated. (Id.). The hearing de novo before the ALJ would go forward on December 20, 2006. (Tr. pp. 155-177).

As noted earlier, plaintiff challenges the Commissioner's decision to deny DIB and SSI benefits on 1 ground, namely, that the ALJ erred in finding that he was not disabled subsequent to the alleged onset date of March 1, 2005. For the reasons that follow, the Court believes that the decision of the Commissioner is supported by substantial evidence and should not be disturbed.

In addressing plaintiff's challenge, the Court recalls that the responsibility of weighing the evidence and determining the credibility of witness' testimony and doctors' opinions lies with the ALJ in the first instance. Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 129 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990). In addition, the law is clear that the burden is upon the plaintiff to produce

objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of.  <u>Selders v. Sullivan</u>, 914 F.2d 614, 618 (5th Cir. 1990); <u>Harper v. Sullivan</u>, 887 F.2d 92, 96 (5th Cir. 1989).  The ALJ must then weigh the plaintiff's testimony and subjective complaints against the objective medical evidence that has been produced.  <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing <u>Jones</u>, 702 F.2d at 621 n.4).  The evaluation of a plaintiff's subjective symptoms is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court.  <u>Harrell</u>, 862 F.2d at 480.  The ALJ may discredit a plaintiff's subjective complaints of pain and other limitations if he carefully weighs the objective medical evidence and articulates his reasons for doing so.  <u>Anderson v. Sullivan</u>, 887 F.2d 630, 633 (5th Cir. 1989)(citing <u>Abshire v. Bowen</u>, 848 F.2d 638, 642 (5th Cir. 1988)).

Despite plaintiff's allegations to the contrary, the objective evidence simply does not support his subjective complaints of being unable to perform any work subsequent to March 1, 2005.  On July 7, 2005, 4 months after the alleged onset date, plaintiff himself reported that he could engage in various daily activities such as routine household chores, driving, grocery shopping, and cooking.  Plaintiff's ability to do so is not indicative of someone who is unable to engage in any work-related activity whatsoever.  <u>Selders</u>, 914 F.2d at 618-19; <u>Anderson</u>, 887 F.2d at 632; <u>Chapparo</u>, 815 F.2d at 1010.  Reports such as the Adult Function Report completed by plaintiff may properly be considered in determining his disability

status. Vaughan v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995); Villa, 895 F.2d at 1022-23. Shortly after describing his daily activities, plaintiff was consultatively evaluated by Dr. Khanolkar whose report is the most comprehensive of any of those that were generated in the relevant time period. Plaintiff admitted to Dr. Khanolkar that he could lift objects up to 20 pounds, could drive 45 minutes at a time, and could mow the lawn but was unable to perform "severe manual labor." On August 5, 2005, a medical consultant concluded that plaintiff was capable of performing light-level work after reviewing the medical and other reports in the record. In doing so, the consultant found credible plaintiff's previous statements to Dr. Khanolkar that he had some difficulty performing "strenuous activity." It was on that basis that the consultant limited plaintiff to work at the light exertional level. The ALJ properly considered the opinions of the medical consultant in determining whether plaintiff was disabled. See 20 C.F.R. §§404.1513(c), 404.1527(f)(2); 20 C.F.R. §§416.913(c), 416.927(f)(2).

Seven months after the Administration medical consultant rendered his findings, plaintiff returned to Dr. Broussard for another set of injections to the shoulder area as they were at that time providing him with relief from his pain. See Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987). The efficacy of the medications was questioned on July 18, 2006 but at no time did Dr. Broussard place any limitations on plaintiff's activities. In a span of 3.5 years, plaintiff saw Dr. Broussard a total of 5 times who treated him conservatively on each occasion. Jones, 702 F.2d

at 522. The frequency and nature of such treatment does not point to a total preclusion to engage in all work activity. (Id.).

The fact that plaintiff suffers from various conditions, standing alone, does not compel the conclusion that he is disabled within the meaning of the Social Security Act. Rather, the Regulations require him to demonstrate that he suffers from impairments which must not only be severe but must also prevent him from performing his past relevant work and any other work which exists in significant numbers. 20 C.F.R. §404.1520(c),(e),(f); 20 C.F.R. §416.920(c), (e), (f). Furthermore, the mere existence of pain or the fact that an individual is unable to work without experiencing pain is not an automatic ground for obtaining disability benefits. Owens v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1985)(citing Jones, 702 F.2d at 621 n.4). At the administrative hearing, the ALJ posed a hypothetical question to the VE which included those functional limitations of plaintiff which have objective support in the record. In answer to that question, the VE identified various jobs in the national and local economies upon which the ALJ could properly conclude that plaintiff was not disabled. Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994). That conclusion has not been rebutted here.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment is granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate

judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this  8th  day of   September  , 2008.

*[signature: Alma L. Chasez]*
UNITED STATES MAGISTRATE JUDGE